IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY D. HARRIS, | ) | Case No. 5:25-cv-02202-RJS |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| v. | ) | |
| | ) | |
| COMMISSIONER OF | ) | **MEMORANDUM OPINION AND** |
| SOCIAL SECURITY, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

## I.     Introduction

Plaintiff, Anthony Harris ("Harris"), seeks judicial review of the final decision of the

Commissioner of Social Security, denying his application for supplemental security income

("SSI") under title XV of the Social Security Act. This matter is before me pursuant to 42 U.S.C.

§§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ")

failed to reach a conclusion supported by substantial evidence, I vacate the Commissioner's final

decision denying Harris' application for SSI and remand his case for further consideration.

## II.     Procedural History

Harris filed for SSI on April 22, 2020, alleging a disability onset date of the same day,

April 22, 2020. (Tr. 1717-25). The claims were denied initially and on reconsideration. (Tr.

1631-34, 1639-40). He then requested a hearing before an ALJ. (Tr. 1641-43). Harris

(represented by counsel) and a vocational expert ("VE") testified before the ALJ on November

17, 2021. (Tr. 1573-1600). On March 1, 2022, the ALJ issued a written decision finding Harris

not disabled. (Tr. 8-24). The Appeals Council denied his request for review on August 28, 2023. (Tr. 1-3). Harris timely appealed that decision in this Court, and, after stipulation by the parties, was remanded back to the Commissioner for further administrative proceedings under Sentence Four of Section 205 of the Social Security Act, 42 U.S.C. § 405(g). *See Harris v. Kijakazi*, 5:23-CV-1884, Doc. 10 (N.D. Ohio Nov. 27, 2023) (Order remanding case to the Commissioner).

After remand, the Appeals Council vacated the March 1, 2022 decision and remanded to an ALJ for further consideration. (Tr. 3147-52). On September 19, 2024, the ALJ held a new hearing, with Harris appearing by telephone. (Tr. 3109-46). On October 3, 2024, the ALJ again issued an unfavorable decision, finding Harris not disabled. (Tr. 3079-99). The Appeals Council again denied his request for review on September 10, 2025, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. §§ 416.1455, 404.1481). Harris timely filed this action on October 15, 2025. (ECF Doc. 1).

## III.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Harris was 43 years old on the alleged onset date, making him a younger individual according to Agency regulations. (*See* Tr. 3098). He has a limited education. (*See id*). He has no past relevant work. (*Id.*).

Educational records from October 1990, when Harris was 14 years old, indicate he was performing at a first-grade level in reading and science, second grade level in math, and third grade in social studies. (Tr. 1809-12). For general information skills, Harris was "very limited," resulting in a pre-first grade score; visual-motor integration skills were similar to a child of four or five years old. (Tr. 1810-11). Harris' Wechsler Intelligence Scale for Children scores indicated a verbal IQ of 66, Performance IQ of 45, and a Full-Scale IQ of 52. (Tr. 1809).

B.      **Relevant Medical Evidence**

Harris presented to the emergency department ("ED") on August 18, 2020, complaining of left side pain; he was diagnosed with left lower quadrant abdominal pain. (Tr. 2212-13). Harris' workup was notable for chronic hypokalemia; his chronic hyponatremia was improved; and he had diverticulosis but no acute findings related to that condition. (*Id.*). He was given 40 mEq of oral potassium, Toradol, and was discharged with a prescription for ibuprofen. (*Id.*).

On August 24, 2020, Harris followed up with Suban Razack, M.D., complaining of leg and back pain, originating from his left paraspinal and flank area, going from the left groin down to above the knee. (Tr. 2153-55). Harris also complained of diffuse abdominal pain without nausea or vomiting and chronic diarrhea. (Tr. 2154). Dr. Razack recommended obtaining blood work and an x-ray of his lumbosacral spine, and taking muscle relaxants, which Harris refused. (Tr. 2154-55). He also recommended Harris take ibuprofen for pain, potassium supplements for hypokalemia, and consider physical therapy. (Tr. 2155).

On October 12, 2020, Harris again presented to the ED complaining of abdominal pain after being diagnosed with an intramural abscess and diverticulitis. (Tr. 2165). He was admitted to obtain labs and imaging. (*Id.*). Testing revealed leukocytosis and hypokalemia. (*Id.*). A CT revealed sigmoid diverticulitis with abscess, stable, and pancreatic uncinate process calcifications most suggestive of chronic calcific pancreatitis. (Tr. 2160, 2176). Surgery was consulted for possible abscess drainage, but the abscess was not amenable to drainage. (Tr. 2178). Harris was provided a 14-day course of ciprofloxacin and metronidazole and discharged in stable condition on October 14, 2020. (*Id.*).

An October 19, 2020 x-ray of the lumbar spine revealed minimal multilevel degenerative disc disease. (Tr. 2157).

On November 23, 2020, Harris met with Nurse Practitioner Janet L. Woehler complaining of an umbilical hernia and diverticulitis. (Tr. 2411-12). He reported stabbing left sided pain and constant diarrhea. (Tr. 2412). Harris agreed to surgical intervention and scheduled a sigmoid colectomy with hernia repair and mesh implant. (Tr. 2412). On November 30, 2020, Harris underwent the colectomy with hernia repair, performed by Stephen Brandstetter, M.D. (Tr. 2418-20). Operative findings revealed the sigmoid colon stuck tightly to the left pelvic wall; it was released and resected, and the umbilical hernia was repaired. (*Id.*). Harris tolerated the procedure well and was discharged on December 2, 2020 in stable condition. (Tr. 2429).

At follow up with Dr. Brandstetter on December 16, 2020, Harris stated he generally felt well and that his bowel function had been much better than prior to surgery, and he no longer had left lower quadrant pain. (Tr. 2440; *see also* Tr. 2474-79). However, Harris reported continued postsurgical pain around his periumbilical incision, and Norco had not been enough to control his pain. (*Id.*). On examination, his abdomen was soft, not distended, and there was no abdominal tenderness, and the incisions were healing well. (Tr. 2442). Dr. Brandstetter added ibuprofen and continued Norco to control pain. (Tr. 2443).

On August 11, 2021, Harris followed up with Dr. Brandstetter, noted ongoing umbilicus pain, denied nausea or vomiting, and reported increased bowel frequency. (Tr. 2467). The umbilicus pain was present with movement or sitting up for long periods, but not made worse by eating. (*Id.*). On examination, Dr. Brandstetter found Harris had a small palpable hernia defect at the umbilicus, with tenderness at that location. (Tr. 2472). He noted Harris was positive for abdominal and back pain, ordered a CT of the abdomen and pelvis, and referred to neurosurgery for the lower back pain. (Tr. 2467, 2471).

4

A September 21, 2021 CT of the abdomen revealed calcifications in the pancreatic uncinate process region, without ductal dilation or pancreatic masses; postsurgical changes in the sigmoid colon with mildly thickened distal transverse and descending colon which may be related to underdistention; and scattered colonic diverticula without evidence of diverticulitis; and postsurgical changes in the right inguinal hernia repair, and some soft tissue attenuation in the periumbilical region suggestive of postsurgical changes, but no periumbilical hernia was identified. (Tr. 2516).

Harris presented to the hospital on October 2, 2021, with a complaint of acute onset abdominal pain that radiated to the back. (Tr. 2694). A CT revealed acute complicated pancreatitis with areas of necrosis. (Tr. 2701, 2705). After consult with infectious disease, Harris was diagnosed with acute pancreatitis with highly inflammatory reaction, leukocytosis, and fever. (Tr. 2694). Harris was provided with IV pain medication, and was discharged against medical advice on October 5, 2021. (Tr. 2708). Harris returned and was readmitted to the hospital on October 5, 2021 and continued on his previous course of IV Zosyn and liquid diet. (Tr. 2535-36). He completed the Zosyn course and demonstrated marked clinical improvement, and was stable for discharge to home with a five-day course of Percocet for pain, Zofran for nausea, and recommendation for a low-fat diet. (Tr. 2536).

On October 31, 2021, Harris presented to the ED complaining of acute onset 10/10 abdominal pain and was admitted to the hospital. (Tr. 2923, 2912). Harris reported that he had stopped drinking two months earlier and had stopped smoking cigarettes two weeks earlier. (Tr. 2912). On examination, his abdomen was soft and nondistended, diffusely tender to palpation in epigastric and right upper quadrant with guarding. (Tr. 2926). He was tachycardic to 101. (Tr. 2923). CT of the abdomen and pelvis showed paraduodenal pancreatitis and a new d2.7 cm cyst

5

at the pancreatic neck, likely a pseudocyst. (*Id.*). Harris was given IV morphine, Zofran, and fluids, and was discharged on November 2, 2021 in stable condition. (Tr. 2919, 2930).

On November 3, 2021, Harris followed with Dr. Brandstetter, who noted Harris had been admitted to the hospital twice with pancreatitis and had consulted with emergency general surgery but had not yet seen a pancreas specialist surgeon. (Tr. 2965). Harris reported that since leaving the hospital, he still had mild epigastric tenderness and pain but had been tolerating a diet with no nausea or vomiting. (*Id.*). Dr. Brandstetter noted that Harris had a small incisional hernia at the umbilicus, but it did not seem to be the source of much pain. (Tr. 2968). Dr. Brandstetter referred Harris to HPV specialists for evaluation of his pancreatitis; any hernia repair would be secondary until treatment for the pancreatitis was better clarified. (*Id.*).

On November 4, 2021, Harris returned to the ED, again complaining of worsening abdominal pain. (Tr. 3000-04). He followed up with general surgery after the most recent discharge and was referred to a pancreatic specialist. (Tr. 3000). His lipase was elevated, consistent with pancreatitis, and he had diffuse abdominal pain on examination but his vital signs were stable. (*Id.*). Harris was again given IV morphine, Zofran, and fluids, and was discharged on November 5, 2021 in stable condition. (Tr. 3009).

On November 15, 2021, Harris returned to the ED, again complaining of epigastric abdominal pain. (Tr. 1516). Harris denied drinking alcohol, shortness of breath, fevers, or chills. (Tr. 1517). He had an appointment with a surgeon the next day. (*Id.*).

On November 26, 2021, Harris again presented to the ED with abdominal pain, similar to his previous pancreatitis flares. (Tr. 1460). He reported working with surgery to obtain an MRI and possible operation for the pancreatic pseudocyst. (*Id.*). He denied recent alcohol use. (*Id.*). On examination, he had diffuse abdominal pain to palpation, with voluntary guarding. (*Id.*).

6

Harris was provided with IV morphine, Zofran, and fluids and demonstrated improvement. (Tr. 1466). He declined obtaining CT imaging to check for complications due to his upcoming surgery consult and was discharged with a three-day course of oxycodone. (*Id.*).

On December 24, 2021, Harris presented to the ED with facial numbness, myalgia, frontal lobe headache, chest and rib pain, epigastric pain, and fever, after testing positive for COVID-19. (Tr. 3481-82). On examination, his bilateral face sensation appeared intact but dull to touch, he had an equal smile bilaterally, dorsi and plantar flexion was intact bilaterally, and he could raise his bilateral lower extremities off of the bed. (Tr. 3484). His symptoms were determined to be a result of COVID-19 and the pancreatic pseudocyst. (Tr. 3488). He was provided with Tylenol to reduce his fever and recommended to take Aleve for pain, and was discharged in stable condition. (*Id.*).

On December 30, 2021, still with active COVID-19, Harris presented to the ED with midsternal chest pain, normal ECG, and low troponins. (Tr. 1313). He was determined low risk for pulmonary embolism; differential diagnosis included chronic pain syndrome, acute coronary syndrome, costochondritis, and pneumonia. (Tr. 1313, 1320). He demanded pain medication in the ED, became verbally aggressive to staff, and was later discharged. (Tr. 1313-14).

On January 18, 2022, MRI imaging showed a 3.1 cm complex pancreatic pseudocyst at the neck/body with loculations, no ductal dilation or radiographic evidence to suggest disruption of the duct, and probable chronic splenic vein occlusion. (Tr. 1296-97; *see also* Tr. 3407-08). Imaging also noted status-post cholecystectomy. (*Id.*).

On March 10, 2022, Harris underwent presurgical testing for removal of the pseudocyst. (Tr. 3710). He presented with chronic necrotizing pancreatitis and complaining of severe 9/10

7

abdominal pain despite diet management and taking Percocet for pain. (*Id.*). Harris was cleared and elected to undergo surgery. (*Id.*).

A March 15, 2022 CT revealed a 5.7 x 2.9 x 3 cm fluid collection along the lesser curvature of the stomach, new compared to a November 1, 2021 CT and larger than the January 2022 MRI; pseudocysts above the head and at the junction of the head and neck of the pancreas; multiple calcifications suggestive of chronic pancreatitis; and possible severe stenosis or chronically occluded splenic vein. (Tr. 473).

On March 17, 2022 Harris underwent a laparoscopic distal pancreatectomy with splenectomy, including lysis of adhesions, pancreatic debridement/necrosectomy, and wound VAC placement. (Tr. 3718-19). Harris tolerated the procedure well and his pain was controlled, although he had mild malnutrition. (Tr. 3721-34). He was discharged home on March 19, 2022 in stable condition. (Tr. 4090-93). On discharge, he was provided oxycodone 5 mg, restricted to lifting no more than 10 to 15 pounds for 2 to 3 weeks, and instructed to follow up in 2 weeks. (*Id.*).

On May 1, 2022, Harris presented to the ED with worsening upper abdominal pain and increased drainage from a left upper quadrant surgical drain. (Tr. 1254). Notes indicated a history of cholecystectomy for acute biliary pancreatitis, recurrent diverticulitis status post sigmoidectomy in November 2020, hemorrhoid surgery and hernia mesh repair, and status-post distal pancreatectomy and splenectomy in March 2022. (*Id.*). Harris reported that he had followed up with Roshan Razik, M.D., on April 27 2022, who ordered a CT of the abdomen and pelvis with IV contrast. (*Id.*). Harris was recommended pancreatic duct stenting along with pancreatic sphincterectomy. (*Id.*). Since the visit with GI, Harris' abdominal pain had increased and was uncontrolled with Percocet, Tylenol, or ibuprofen. (*Id.*). CT imaging on May 2 showed a

4.3 by 5.4 cm rim-enhancing peripancreatic collection consistent with walled-off necrosis, no gas, and fluid around the drain; the pseudocyst was no longer seen, but previous findings of chronic pancreatitis were unchanged. (Tr. 4519-20). Harris was discharged with two days of Percocet and recommended to follow up with the surgery team. (Tr. 1254-60).

On May 10, 2022, Harris again presented to the ED with sharp epigastric and left sided abdominal pain that radiated to his right side, chronic diarrhea, and noted that he was scheduled to have a drain placed the next day to resolve complications from the removal of his spleen and part of his pancreas. (Tr. 1227). Harris reported 10/10 pain; notes indicated he followed with pain management and had recently been weaned off of narcotics and was on 300 mg of gabapentin 3 times daily. (*Id.*). CT of the abdomen revealed no new findings. (Tr. 1233). Harris was provided one dose of morphine so as not to interfere with narcotics tapering. (Tr. 1233-34). After consult with surgery and GI, he was recommended hospital admission to prepare for surgery; Harris declined admission and elected to return the next day. (*Id.*).

On May 11, 2022, Harris underwent an endoscopic retrograde cholangiopancreatography ("ERCP") with pancreatic sphincterotomy, pancreatogram, and stent placement. (Tr. 1213). Procedure results revealed evidence of a high-grade leak emanating from the pancreatic duct stump, and a stent was placed. (*Id.*). He tolerated the procedure well. (*Id.*). CT on May 12, 2022 confirmed pancreatic duct stent terminating in the duodenum, with similar left upper quadrant fluid collection. (Tr. 1211-12).

On May 13, 2022, Harris again presented to the ED with complaints of midsternal chest pain, with associated dizziness. (Tr. 1194). Chest x-ray revealed mild bibasilar atelectasis, with superimposed infection possible. (Tr. 1197). ECG was abnormal but unchanged with the previous comparison of December 30, 2021. (Tr. 1195).

A May 27, 2022 CT revealed postoperative changes of the pancreas with duct stent in place; multiple calcifications in the head consistent with chronic pancreatitis; and fluid collection in the left upper quadrant stable in size from the prior CT. (Tr. 1190).

On May 29, 2022, Harris presented to the ED with shortness of breath and chest pain. (Tr. 1148). He also complained of abdominal pain, persistent since the surgery to remove the pseudocyst. (*Id.*). CT of the abdomen showed no evidence of acute pulmonary embolism, but the distal pancreatectomy collection now containing gas, suggesting fistula to the posterior duodenal bulb or antrum, as well as reactive gastric and duodenal wall thickening. (Tr. 1152). Surgery was consulted, and planned to have Harris return for direct admittance for pain control, antibiotics, and GI consult for possible Axios stenting. (Tr. 1159-60). Harris was admitted May 30, 2022 for GI consult, who determined that the Axios stent was not necessary, and that his abdominal pain was likely secondary to the ERCP done on May 11. (Tr. 4364). Dr. Razik recommended discharge with outpatient follow-up, repeat imaging in one week, and continue with the repeat ERCP on June 28, 2022. (Tr. 4370-71).

On June 6, 2022, Harris returned to the ED with chest and abdominal pain and nausea, and complained of a low-grade fever. (Tr. 1030). Repeat CT revealed slightly larger fluid collection in the lesser sac in the left upper quadrant with a stent in place; labs were remarkable for a white blood count of 14.3. (Tr. 1030-35). He was admitted to surgery service with enlarging fluid collection and the GI team consulted for possible endoscopic drainage. (Tr. 1030). Harris was provided antibiotics and pain management. (Tr. 1037). On June 7, 2022, Harris underwent an endoscopic ultrasound and esophagogastroduodenoscopy and biopsy, which showed a 5.2 x 3.1 cm collection, mainly debris, 1.4 cm from the gastric wall and not in a good position for hot Axios stent placement. (Tr. 1061-62). Dr. Razik recommended following up with

10

pathology/cytology and considering surgical cystgastrostomy if needed and eventual ERCP to retrieve the stent that had been placed previously. (*Id.*).

On June 14, 2022, Harris again presented to the ED with epigastric pain and GI was consulted. (Tr. 980-87). CT showed a decreasing 5.5 x 2.1 cm collection, resolution of the previously seen gas that was suggestive of fistulous formation, and the PD stent in place. (Tr. 1003). Dr. Razik noted the stent was in good position and the fluid collections were decreasing in size; he recommended continuing with the planned stent removal on June 28. (Tr. 987).

On June 16, 2022, Harris returned to the ED with recurrent pain, was admitted for GI consultation, and again recommended to keep the June 28 appointment with Dr. Razik for ERCP and stent removal. (Tr. 941-47). On June 19, 2022 he again presented with chest and abdominal pain; notes indicated that Harris had recently been admitted to the hospital three times and left against medical advice each time. (Tr. 910). His vital signs and white blood cell count were normal, and lipase trending down to within normal limits. (*Id.*). Differential diagnoses included UTI, small bowel obstruction, pancreatitis, gastroenteritis, diverticulitis, cholangitis, cholecystitis, and cholelithiasis. (Tr. 915). He was provided with pain medication in the ED and discharged with a three-day course for home pain management, recommendation to follow up with GI, and a referral for pain management. (*Id.*).

On June 28, 2022, Harris underwent the planned ERCP without complication; the pancreatogram revealed no leak. (Tr. 899).

Harris presented to the ED with continued complaints of abdominal or chest pain on July 1, 10, 20, August 11, September 10, and October 24, 2022. (Tr. 742, 749-50, 801-05, 815, 834, 839-40, 854, 859-60). Imaging results during these visits revealed chronic calcific pancreatitis but were otherwise normal. (*Id.*).

11

On January 12, 2023, Harris presented to the ED with epigastric pain, nausea, vomiting, and diarrhea for the past three days. (Tr. 553-54, 558). He was provided IV fluids, morphine, and Zofran. (*Id.*). CT showed prior pancreatectomy changes with mild edema at the resection site suggesting possible recurrent pancreatitis versus gastritis or peptic ulcer disease. (Tr. 560-62). Harris refused admittance and left against medical advice. (Tr. 553). Harris returned later that night after experiencing heart palpitations, chest pain, and tachycardia with a heart rate in the 160s at home. (Tr. 543).

On February 14, 2023, a celiac plexus neurolysis was attempted, but Harris was unable to lay on his stomach despite sedation and the procedure was aborted. (Tr. 538). On March 23, 2023, Harris successfully underwent a CT-guided celiac plexus block for necrotizing and chronic pancreatitis, reducing pain from 9/10 to 7/10. (Tr. 4873-74).

On March 27, 2023, Harris returned to the ED complaining of weakness, back pain, and bowel incontinence. (Tr. 508). Chest x-rays were unremarkable. (Tr. 509). CT imaging showed expected findings related to the celiac plexus block; mild degenerative disc and facet changes; multilevel disc bulges; and moderate to severe bilateral neural foraminal narrowing at L4-5 and L5-S1. (Tr. 511-13).

On April 17, 2023, Harris presented to the ED with complaints of back and abdominal pain, nausea, vomiting, and diarrhea. (Tr. 7688-97). CT revealed atrophy of the pancreatic body and wall thickening of the distal transverse and descending colon, likely related to ulcerative colitis. (Tr. 7686-87). He was recommended to transfer to Akron General Hospital where he could be seen by Dr. Ali. (Tr. 7696-97).

Harris again returned to the ED on May 9, 14, 24, June 29, August 22, September 11, October 14, November 3, 8, and 24, 2023, complaining of abdominal pain, vomiting, diarrhea,

and nausea. (Tr. 6637-48, 6752-59, 6847-54, 7236-48, 7136-41, 7326-31, 7404-10, 7496-7501, 7584-92, 7775-83). Imaging during these visits were largely similar to previous results. (*See generally id.*). Harris' diagnoses remained ulcerative colitis and chronic pancreatitis; he was treated with IV fluids, pain management, and Zofran. (*See, e.g.*, Tr. 6644, 6756, 7248, 7331, 7409-10, 7501, 7591, 7782-83).

On May 22, 2023, Harris presented to Dai Kohara, D.O. at Family Medicine Stow Falls to establish care; Dr. Kohara diagnosed him with chronic pancreatitis, insomnia, and lumbar degenerative disc disease. (Tr. 6485). Harris described his back pain as shooting, radiating to his left and right thigh, aggravated by twisting and bending; his abdominal pain was both pressure-like and sharp, brought on by eating, and included arthralgias and myalgias. (Tr. 6487). On examination, Harris had abdominal tenderness in the epigastric area, and spasms and tenderness in his thoracic and lumbar back. (Tr. 6489-90). Dr. Kohara referred Harris to gastroenterology for his abdominal pain and recommended Harris follow up with his neurologist consult for his back pain. (Tr. 6490).

On July 19, 2023, Harris presented to Katie Little, PA-C, also in Dr. Kohara's office, complaining of cough, nausea, hemorrhoids, and abdominal pain since the surgery the year before. (Tr. 6463). On examination, he had generalized abdominal tenderness and guarding. (Tr. 6465). PA Little prescribed Zofran as needed for nausea; 5% lidocaine patches and 325 mg of acetaminophen for abdominal pain; and hydrocortisone 2.5% for hemorrhoids. (Tr. 6465-66). She also referred him to gastroenterologist Dr. Siddiki. (Tr. 6466).

On October 25, 2023, Harris presented to Aaron Didich, D.O. at Family Medicine Stow Falls, requesting disability forms completed due to his back and leg pain. (Tr. 6554). Dr. Didich recommended a consult with spinal surgery for his degenerative disc disease, as well as receiving

13

a physical performance test and consult with physical therapy, but stated he could not complete the forms since he was not Harris' primary provider. (Tr. 6557).

On October 11, 2023, Harris presented to Michael O'Reilly, O.D., for a vision exam. (Tr. 6547). His history noted migraines, loss of vision, blurred vision, itching, high blood pressure, diarrhea, and sleep apnea, as well as long standing blindness in the right eye. (*Id.*). Dr. O'Reilly diagnosed Harris with blindness in his right eye, category 3; normal vision in the left eye; and chronic allergic conjunctivitis. (Tr. 6548).

On February 28, 2024, Harris followed up with neurosurgeon Enyinna Nwachuku, M.D. after referral from Dr. Didich. (Tr. 8317-21). Harris reported that prior to the March 17, 2023 pancreatectomy and splenectomy surgery, he was given a spinal block. (Tr. 8318). When he woke up from the surgery, he had excruciating low back pain with radiation to his left hip and left thigh. (*Id.*). Since the surgery, he has had episodes of numbness in his left leg and face, feels generally weaker and limited by pain, and has had urgent bowel incontinence and diarrhea. (*Id.*). He also reported balance issues and multiple recent falls. (*Id.*). He started physical therapy three weeks prior. (*Id.*). He reported shooting 9/10 pain in his back and left leg, and numbness. (*Id.*). On examination, he had full range of motion and strength in all extremities. (Tr. 8320). He could ambulate without assistance, but exhibited an antalgic gait favoring the right leg. (*Id.*). Dr. Nwachuku believed Harris' symptoms were likely related to nerve root damage or irritation from the spinal block. (Tr. 8321). Dr. Nwachuku recommended Harris continue with physical therapy, establish with pain management, and send his recent MRI results for review, and follow up thereafter. (*Id.*).

14

An MRI of the lumbar spine from March 12, 2024 indicated multilevel degenerative changes, worst at L4-L5 with severe bilateral neural foraminal narrowing. (Tr. 8337). Clinical indication was noted as back pain with cauda equina syndrome. (*Id.*).

Harris continued to present to the ED on January 24, March 6, 24, 27, April 8, 11, 17, 19, 25, 28, May 8, 12, 23, 29, June 21, 22, 26, and July 8, 2024 with complaints of falls, pain, including chest pain, abdominal pain, lower extremity numbness, tingling, and weakness. (Tr. 8150-55, 8236-40, 8382-8434, 8457-67, 8482-8528, 8532-40, 8564-74, 8588- 8619, 8632-44, 8654-60, 8673-92, 8714-23, 8735-45, 8754-61, 8905-15). Harris generally received symptomatic treatment at these visits. (*See id.*). Significant findings included worsening thickening of the stomach, duodenum, and proximal to mid small bowel in a June 26, 2024 CT scan (Tr. 8464, 8478), bowel incontinence (Tr. 8459, 8484), and moderate to severe foraminal stenoses in the lumbar spine during a June 21, 2024 spinal MRI (Tr. 8527-28).

On June 25, 2024, Harris was assisted by Stephanie Golden, BASW, with Community Support Services, after being found sleeping in a car. (Tr. 8782). He was observed as showing signs of anxiety and had difficulty providing information, such as spelling his doctor's name and address or completing paperwork. (*Id.*). Ms. Golden assisted Harris in completing forms to connect him with the United Way, housing support, and made referrals to behavioral health. (*Id.*).

**Medical Opinion Evidence**

### 1.       State Agency Medical Reviewers[1]

On December 13, 2023, at the initial level for the current claim, state agency reviewer Steve McKee, M.D. opined that Harris had the capacity for light work, but could never climb

---

[1] The administrative transcript submitted by the Commissioner does not appear to contain the state agency reviewing opinion evidence at the reconsideration level from the current claim. (*See* ECF Doc. 8).

15

ladders/ropes/scaffolds; occasionally stoop, crouch, or crawl; frequently climb ramps/stairs; and frequently kneel. (Tr. 3190). He was to avoid all exposure to hazards such as operation of heavy machinery and work around unprotected heights, but had no limitations to other environmental hazards. (Tr. 3191).

On February 29, 2024, at the initial level, state agency reviewer Ann Lovko, Ph.D., opined that Harris was capable of understanding and remembering simple one to three step tasks; could sustain concentration and persistence for simple, routine tasks; was capable of superficial interactions with coworkers and supervisors in a nonpublic setting; and capable of adapting to infrequent changes in a work setting. (Tr. 3191-93).

### 2. Consultative Examiners

#### a. E.M. Bard, Ph.D., ABPP

On February 6, 2024, Harris underwent a psychological evaluation performed by E.M. Bard, Ph.D., ABPP. (Tr. 8130-35). Harris reported previously being on benefits due to his eye injury and learning disability, and was seeking to reinstate benefits due to his back problems, chronic pain in his legs and back, previous surgeries, and ongoing elimination problems. (Tr. 8130). Harris reported needing to use the bathroom at least 50 times a day, and that no one would hire him as a result. (*Id.*). Dr. Bard noted that Harris asked to use the bathroom 3 times during the 90-minute exam. (Tr. 8130-31). Harris reported a previous alcohol abuse history, but had been sober from alcohol since age 37, and no longer smoked marijuana or tobacco products. (Tr. 8132). He was compliant with his prescribed medications, and would generally only take Tylenol for pain. (*Id.*). He described his pain as a 7/10 during the examination. (Tr. 8130). He reported that he could perform basic chores at home and could independently care for himself, but has no specific responsibilities at home. (Tr. 8133). He stated he could tell time (but could not draw a

16

clock correctly), could not read the newspaper or follow a recipe, would have difficulty counting money, cannot operate a computer, and needs assistance to read his mail. (*Id.*).

On examination, Dr. Bard observed that Harris was laying on his back in the waiting room, often needed to walk around and change positions during the examination, and requested a cushion to sit on. (*Id.*). His mood and affect were euthymic, he did not exhibit signs of anxiety, and he was cooperative with the examination. (Tr. 8133). Dr. Bard diagnosed Harris with adjustment disorder with depressed mood (secondary to reported physical ailments); borderline intellectual functioning; unspecified elimination disorder with fecal symptoms, chronic; and cannabis and alcohol use disorders in remission. (Tr. 8135). Dr. Bard indicated that Harris may need assistance of a competent adult to manage his personal finances. (*Id.*).

In Dr. Bard's opinion, Harris could handle one and two step instructions without difficulty, but may have difficulty understanding and carrying out complex instructions; and he appeared to have a below average ability to sustain concentration, persistence, and pace. (*Id.*). Dr. Bard also opined that he would likely be able to interact with supervisors, coworkers, and customers, but that he may have difficulty interacting with other individuals in the community. (Tr. 8136). His symptoms of anxiety and depression would not impact his ability to deal with employment expectations within his level of competency, training, and with appropriate supervision. (*Id.*).

### b.      Trevor Shaver, PA-C

On June 18, 2024, Harris underwent a physical consultative examination with Trevor Shaver, PA-C. (Tr. 8352-66). Harris claimed disability due to IBS, bowel leakage, learning disability, and because he could not see out of his right eye. (Tr. 8352). On examination, Harris could not easily squat, get up from his chair, walk on heels or toes, stand on one foot, or hop on

17

one foot. (Tr. 8354). He had issues with tandem gait, and straight leg raise was positive bilaterally, both seated and supine. (Tr. 8354, 8357, 8360). He ambulated with an assistive device, and his gait was slow, limping, and antalgic. (*Id.*).

In PA Shaver's opinion, Harris had mild to moderate limitations with sitting, moderate to severe limitations with standing and walking, and required the use of an assistive device. (Tr. 8355). He could never lift or carry any weight. (Tr. 8355, 8361). He could sit for 20 minutes, stand for 20 minutes, and walk for 5 minutes, once in an 8-hour workday; when not sitting, standing, or walking, Harris would need to lay down. (Tr. 8362). In PA Shaver's opinion, a cane was medically necessary to ambulate, and Harris would not be able to use his free hand to carry small objects. (*Id.*). Harris could never climb stairs and ramps, ladders or scaffolds, bend, stoop crouch, crawl, or squat. (Tr. 8355, 8364). He could occasionally reach, grasp, handle, finger, feel, push/pull, and use foot controls bilaterally. (Tr. 8363). He had relevant visual, communicative, or workplace environmental limitations. (Tr. 8355).

### c.     Charles Misja, Ph.D.

On August 30, 2024, Harris underwent a second psychological evaluation, performed by Charles Misja, Ph.D. (Tr. 8899-8903). Harris reported being homeless at the time, although he had also lived with friends and did his laundry at his grandmother's house. (Tr. 8900-01). Harris reported that he did not have a driver's license and would walk to get around. (Tr. 8901). Harris also stated that in past jobs he understood his tasks, could keep up with the pace of work, and would show up to work on time. (*Id.*). He reported adequate interaction with supervisors and coworkers. (*Id.*).

On examination, Harris was initially cooperative but became defensive at some questions; he had broad affect and stable mood; denied being depressed; did not exhibit anxiety

18

symptoms; and was oriented in all spheres. (Tr. 8901-02). He had poor insight and judgment. (Tr. 8902). Dr. Misja estimated Harris was in the borderline range of intellectual functioning. (*Id.*). Dr. Misja assessed Harris with an Other Personality Disorder with antisocial features. (*Id.*).

In Dr. Misja's opinion, Harris may require assistance to understand, remember, and implement ordinary instructions; he would likely have intermediate to severe limitations in responding appropriately to supervision and coworkers; and would have intermediate to severe limitations in responding appropriately to work pressures. (Tr. 8903).

### 2. Prior State Agency Medical Reviewers

On August 10, 2020, state agency reviewer Jaime Lai, Psy.D. opined that Harris had the capacity to perform one to three step tasks that are fairly static in nature in a setting without fast paced demands or strict production quotas; could have brief superficial interactions in a setting where he is not required to have work-related contact with the public; and can perform a set of routine tasks in a setting where changes are infrequent and easily explained in advance. (Tr. 1611). At the reconsideration level on June 18, 2021, Irma Johnston, Psy.D., affirmed. (Tr. 1621-23).

On February 25, 2021, Rannie Amiri, M.D., opined that the evidence in the file was insufficient to assess the severity of Harris' physical impairments. (Tr. 1606). On July 6, 2021, at the reconsideration level, Lynne Torello, M.D., opined that Harris had the capacity to perform light work with the additional postural limitations of occasionally climbing ramps/stairs; occasionally climbing ladders/ropes/scaffolds; occasionally stooping, crouching, and crawling; and frequently kneeling. (Tr. 1620-21; 1623-24).

### 3. Prior Consultative Examiners

#### a. Sudhir Dubey, Psy.D.

19

On April 30, 2014, prior to the application date, Harris underwent a psychological consultative examination before Sudhir Dubey, Psy.D. (Tr. 1835-43). Dr. Dubey administered the Wechsler Adult Intelligence Scale – 4th Edition; Harris' scores included Verbal Comprehension score of 52; Perceptual Reasoning Index score of 0; Working Memory Index Score of 50; and a Processing Speed Index score of 50. (Tr. 1836). All scores were in the "extremely low range." (Tr. 1836-37). Harris' full-scale score could not be determined, in part due to his scoring 0s on some portions; Dr. Dubey indicated that results were likely an underestimate of his full-scale IQ score. (Tr. 1836). Dr. Dubey estimated Harris' overall full-scale functioning was more likely in the borderline range. (*Id.*). Dr. Dubey diagnosed Harris with an unspecified personality disorder; alcohol, cannabis, and cocaine use disorders, severe in sustained remission; depressive disorder; and borderline intellectual functioning. (Tr. 1841).

Dr. Dubey opined that Harris could understand, remember, and carry out both simple, one-step and multi-step processes independently; Harris could independently maintain persistence and pace for simple instructions, but would need supervision for multi-step instructions. (Tr. 1841-42). Harris would have issues dealing with coworkers and supervisors due to mood related problems and associated frustrations. (Tr. 1842). In Dr. Dubey's opinion, Harris would have "many issues dealing with work pressure. This is related to possible problems stemming from intellectual limitations and mood related problems leading to associated frustration for the claimant, co-workers, and supervisors." (Tr. 1843). Dr. Dubey opined Harris could not manage his own benefits. (Tr. 1840).

### b.      Joshua Magleby, Ph.D.

On March 19, 2018, prior to the filing date, Harris underwent a psychological consultative examination with Joshua Magleby, Ph.D. (Tr. 1849-55). Dr. Magleby diagnosed

20

Harris with unspecified personality disorder (antisocial and borderline traits); adjustment disorder with anxiety; cannabis abuse disorder in sustained remission; depressive disorder; unspecified stimulant-related disorder; and borderline intellectual functioning. (Tr. 1853). Dr. Magleby opined Harris might need a payee, should benefits be awarded. (Tr. 1854).

In. Dr. Magleby's opinion, Harris was generally impaired in his ability to follow complex instructions or perform multi-step tasks, but had "fairly adequate" ability to perform a simple, repetitive task. (*Id.*). He was somewhat impaired in his ability to relate to peers, coworkers, and supervisors, and in his ability to withstand the mental stress and pressure of daily work. (*Id.*).

### c.      Mark Vogelsgang, M.D.

On April 30, 2018, prior to the filing date, Harris underwent a physical consultative examination performed by Mark Vogelsgang, M.D. (Tr. 1858-61). Dr. Vogelsgang diagnosed Harris with hypertension and blindness in his right eye, and noted a history of low back pain. (Tr. 1860). Dr. Vogelsgang opined that Harris "may be able to tolerate light to sedentary work" and "may have to avoid excessive bending or twisting" due to Harris' back pain. (Tr. 1861).

### d.      Mary File, M.D.

On May 2, 2014, Harris underwent an ophthalmological/optometric consultative examination with Mary File, M.D. (Tr. 1846-48). Dr. File noted a macular hole in his right eye stemming from a 1989 BB gun injury. (Tr. 1846). Harris was blind in his right eye, and had 20/20 – 2 vision in his left eye. (*Id.*). In. Dr. File's opinion, Harris should not climb heights or operate heavy machinery, and he should wear protective glasses at all times. (Tr. 1847).

### B.      Administrative Hearing Evidence

On September 19, 2024, Harris, represented by counsel, appeared at a hearing before ALJ Michael Schmitz. (Tr. 3109-46). Harris testified that he lives with his aunt, has no income, and

21

relies on his aunt for assistance with mobility, toileting, and doing chores such as laundry, groceries, and cooking meals. (Tr. 3118-20). He also receives assistance from a family friend; she will help him down the steps, get into the shower, or do his laundry. (Tr. 3129). He does not drive and instead has someone pay for rides to his appointments. (Tr. 3120).

Harris testified that he left school after 11th grade, was in special education with one-on-one help while in school, and stated he cannot read. (Tr. 3120-21). He attempted to obtain a GED, but was told he had taken too long and never completed it. (Tr. 3120). He could do simple math problems like make change for a $20 bill. (Tr. 3121). He had not worked since 2005. (*Id.*).

Harris testified that he could not work because he "kept getting sick and they couldn't find out what was going on," despite him going in and out of the ER. (Tr. 3121). He reported going twice to the ER that week, once for a dental infection after extractions and the second time for abdominal, pancreatic, and back pain. (Tr. 3122). He testified that even though he was compliant with a low-fat diet, his stomach hurts and the food "comes right back out of me." (*Id.*).

Harris stated that in the ER, a scope was suggested to figure out why he continued to have problems, and that he had persistent leakage at a drainage site on his ribs. (Tr. 3123). He had also attempted to see a specialist for his back pain, but stated he could not because they were booked until the next year. (Tr. 3123-24). The doctors he sees have recommended he see a specialist before determining if back or neck surgery is necessary. (Tr. 3125). He estimated he could walk on a flat surface only to the kitchen or bedroom; he does not use a cane or walker, but he does wear a leg brace. (*Id.*). He will walk up and down the stairs as part of his physical therapy, but often falls. (Tr. 3124). Some of the falls are bad enough to require medical attention. (*Id.*).

He does not take pain medications, muscle relaxers, or anti-inflammatories, except for short, three-day periods of Percocet use. (Tr. 3125). He uses an inhaler twice daily for his emphysema. (Tr. 3126).

Harris testified that he was about to begin behavioral health treatment, and had a pending appointment with a psychiatrist, and was working on starting therapy. (Tr. 3126). He described having PTSD, with nightmares happening twice weekly, but no flashbacks while awake. (Tr. 3128). He denied past psychiatric hospitalization but described having anxiety and anger issues. (Tr. 3127-28). Harris testified that he previously had issues with alcohol and marijuana, but he had abstained from all substances, including tobacco, for a year. (Tr. 3131-32).

Harris testified he is blind in his right eye but has no issues with his left eye. (Tr. 3125). However, Harris reported he gets migraines once or twice a week because of the injury to his right eye. (Tr. 3132-33). To relieve his migraines, Harris lays in a dark room with a hot towel on his head. (Tr. 3132). Harris testified needing to use the bathroom frequently, stating he could be in the bathroom "every 5 or 30 seconds." (Tr. 3128).

VE Thomas Nimberger then testified. (Tr. 3136). The ALJ determined that Harris had no past relevant work, and proceeded to the following hypothetical: An individual of Harris' age, education, and vocational background, who could work at the light exertional range, with additional limitations to never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; occasionally stoop, kneel, crouch, and crawl; could frequently balance; the individual could not perform tasks which require peripheral vision on the right side but on his own could avoid ordinary workplace hazards, such as boxes on the floor, doors ajar, approaching people, or vehicles; he could have only occasional exposure to extreme cold, extreme heat, vibrations, humidity, and pulmonary irritants, such as fumes, odors, dust, gases, and poor ventilation; but

23

avoid all exposure to hazards, such as unprotected heights, dangerous moving mechanical parts, and commercial driving; he could understand, remember, and carry out simple instructions; but he could not perform tasks requiring a specific production rate, such as assembly line work or an hourly production quota; he could make only simple, work-related decisions, and he should not be responsible for the safety or welfare of others; he could interact on an occasional basis with supervisors and coworkers, but should not be required to perform tasks which require contact with the general public; he should be limited to superficial contact, meaning no group, tandem, or collaborative tasks, as well as no management direction or persuasion of others; the individual could respond appropriately to occasional change in a routine work setting, but those changes would need to be easily explained and/or demonstrated in advance of gradual implementation. (Tr. 3136-38). VE Nimberger identified the following jobs: Office Cleaner, DOT 323.687-014, light, unskilled, SVP 2, with 200,000 jobs in the national economy; Marker, DOT 209.587-034, light, unskilled, with 129,000 jobs in the national economy; and Food Service Worker, kitchen, DOT 311.677-010, light, unskilled, SVP 2, with 29,000 jobs in the national economy. (Tr. 3138-39).

The ALJ then asked a second hypothetical, keeping all the same limitations, but reducing the individual to a sedentary RFC. (Tr. 3139). In response, the VE testified that reducing to a full-time, unskilled, sedentary exertional level would eliminate most jobs in the national economy. (Tr. 3139-40). He may be able to identify two unskilled sedentary jobs with sufficient national numbers, but it would be difficult to identify a job that was responsive to the other limitations in the hypothetical. (*Id.*). With this testimony, the ALJ determined that continuing with sedentary hypotheticals would "belabor the point" and instead continued with light exertional hypotheticals. (Tr. 3140).

24

The VE testified that if the first hypothetical individual needed occasional redirection or extra supervision to stay on task, the three jobs identified would be eliminated. (Tr. 3140). Further, this limitation would likely eliminate all work. (*Id.*).

The ALJ then further reduced the first hypothetical to work in isolation, with only occasional interaction with supervisors, but no coworker or public interaction. (Tr. 3140-41). In response, VE Nimberger testified that, based on his training, education, and experience, all work would be eliminated. (Tr. 3141).

The VE testified that off-task tolerance for unskilled work is only 1 to 10% during the workday; at or above 20% off-task is unacceptable. (*Id.*). However, if there is a chronic problem where the person is not competitive or productive enough, there would be no work. (*Id.*). Likewise, employers will tolerate one to two days per month, but chronic absenteeism of two or more days per month precludes all work. (Tr. 3141-42). If a person needed a short, on-schedule bathroom break or two during the workday, it may be tolerated. (Tr. 3142-43). However, unscheduled breaks of five minutes or more two or three times daily would not be tolerated. (*Id.*).

Harris' attorney then questioned the VE, if any jobs would remain if the first hypothetical individual were unable to read or write. (Tr. 3143-44). VE Nimberger opined that not being able to read or write would likely not affect unskilled work, once they have learned the job. (Tr. 3144). However, to accommodate certain limitations, he would reduce certain jobs, such as Office Cleaner, to 50,000 jobs in the national economy. (*Id.*). If the individual required an assistive device, such as a cane, sedentary work would result, and all work would be precluded. (*Id.*).

## II.      The ALJ's Decision

1. The claimant has not engaged in substantial gainful activity since April 22, 2020, the application date (20 CFR 416.971 et seq.).

2. The claimant has the following severe impairments: gastro-esophageal reflux disease (GERD), diverticulosis, abscess of sigmoid colon, fecal incontinence, and idiopathic chronic/acute pancreatitis; lumbar degenerative disc disease, spinal stenosis with neurogenic claudication. and sciatica; cervical degenerative disc disease; blind in the right eye; emphysema; umbilical and inguinal hernias; adjustment disorder with depressed mood; mood disorder; personality disorder; post-traumatic stress disorder (PTSD); and borderline intellectual functioning (BIF) (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs; occasionally stoop, kneel. crouch, and crawl; frequently balance; cannot perform tasks that require peripheral vision on the right side, but can on his own avoid ordinary workplace hazards such as boxes on the floor, doors ajar, and approaching people or vehicles; occasional exposure to extreme cold and vibrations, extreme heat, humidity. and pulmonary irritants such as fumes, odors, dusts, gases and poor ventilation; avoid all exposure to hazards such as unprotected heights, dangerous moving mechanical parts, and commercial driving; he can understand, remember and carryout simple instructions, but cannot perform tasks which require a specific production rate pace (such as assembly line work or an hourly production quota); can make only simple work-related decision, and should not be responsible for the safety or welfare of others; can interact on an occasional basis with supervisors and coworkers, should not be required to perform tasks which require contact with the general public, and should be limited to superficial contact meaning no group, tandem or collaborative tasks, and management, direction or persuasion of others; and can respond appropriately to occasional change in a routine work setting, as long as any such changes are easily explained and/or demonstrated in advance of gradual implementation.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on August 14, 1976 and was 43 years old. which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

26

7. The claimant has a limited education (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since April 22. 2020. the date the application was filed (20 CFR 416.920(g)).

(Tr. 3084-99).

## III. Law & Analysis

### A. Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B. Standard of Review

27

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical

28

bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

## IV. Discussion

Harris brings two issues for this Court's consideration:

1. Whether the RFC finding of the ALJ was supported by the evidence, and the rejection of his treating physician's opinion legally sufficient; and

2. Whether the ALJ failed to address the opinions of non-treating, non-examining State Agency Medical Consultants, Rannie Amiri, M.D., Lynne Torello, M.D., Jaime Lai, Psy.D. and Irma Johnston, Psy.D as required by regulation and law.

(ECF Doc. 10, p. 1).

### A. The ALJ's RFC finding was not supported by substantial evidence.

Harris argues that the ALJ did not support his RFC findings with substantial evidence. (ECF Doc. 10, pp. 31-36). In essence, Harris argues that the minimal changes between the 2022 RFC subject to the remand order and the current RFC from October 3, 2024, do not account for the additional severe impairments found between the two decisions. (*Id.* at p. 32, citing to Tr. 14, 16-17). Namely, in the 2024 decision, the ALJ found Harris had the additional severe impairments of fecal incontinence, neurogenic claudication of the lumbar spine, adjustment disorder with depressed mood, and PTSD, but the reduction from frequent to occasional use of ramps and stairs and the reduction from avoiding concentrated exposure to only occasional

exposure to extreme heat and extreme cold, humidity, vibrations, and pulmonary irritants such as fumes, odors, dust, gasses, and poor ventilation did not properly account for these additional severe impairments. (*Id.*). Harris asserts these additional severe impairments, supported by multiple opinions the ALJ found persuasive, as well as the bulk of the significant medical record in this case limit his ability to complete a normal workday or work week, and would result in significant absenteeism. (*Id.* at pp. 32-35). And the ALJ's failure to address these additional severe impairments without responsive limitations in the RFC results in a decision that fails to create a logical bridge between the evidence and the result. (*Id.* at pp. 36).

The Commissioner simply asserts the ALJ reasonably determined Harris' RFC, and that the ALJ need not calculate a claimant's absenteeism rate, nor include such general issues within a person's specific RFC. (ECF Doc. 13, pp. 3-5). According to the Commissioner, the ALJ properly supported the decision with substantial evidence, for example, by considering, explaining, and discounting the reasons Harris had frequent emergency department visits. (*Id.* at pp. 5-6 (citing to Tr. 3090, 3094, 3424-25, 6557)).

I agree with Harris on this matter. An ALJ is tasked with creating an RFC that is responsive to all of a claimant's severe impairments, supporting that RFC decision with substantial evidence, and explaining the decision in a way that creates a logical bridge between the evidence and the result. But the RFC in this case does not appear to respond to Harris' severe impairment of fecal incontinence, nor does the ALJ explain why.

When a claimant shows they have a severe impairment, the ALJ must then consider all of their impairments – even ones that are not "severe" – at the remaining steps in the sequential evaluation. *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting SSR 96-8p, 1996 WL 374184 (Jul. 2, 1996)). Then, before proceeding to Step Four of the sequential

30

analysis, the ALJ is required to assess the claimant's RFC. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 61 Fed. Reg. 34474, 34475 (1996)). An ALJ must consider all relevant evidence in the case record, including a claimant's severe and non-severe impairments. 20 C.F.R. § 404.1545(a)(2). Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a).

Furthermore, a claimant's subjective symptom complaints are among the evidence that an ALJ must consider in assessing a claimant's RFC at Step Four. *See* 20 C.F.R. § 416.920(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability."). Generally, an ALJ must explain whether she finds the claimant's subjective complaints consistent with objective medical evidence and other evidence in the record. SSR 16-3p, 2017 WL 5180304, at \*10 (Oct. 25, 2017); *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (The ALJ must clearly explain their reasons for discounting subjective complaints). In conducting this analysis, the ALJ may consider several factors, including the claimant's efforts to alleviate his symptoms, whether any treatment was effective, and any other factors concerning the claimant's functional limitations and restrictions. SSR 16-3p; 20 C.F.R. § 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

The regulations do not require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports her decision. *See*

31

*Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

The basic substantial evidence standard bears repeating. When determining a claimant's RFC, the ALJ must yet support and explain their decision with substantial evidence. And substantial evidence is a low standard, requiring only it is reasonably adequate to support the ALJ's conclusions. *Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000, 1004 (6th Cir. 2025); *see also Biestek*, 587 U.S. at 103. But even so, the court will not uphold an ALJ's decision if the reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877 *and Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."). Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning. And it is on the logic that the ALJ's RFC decision fails to explain itself.

Here, the ALJ found Harris had a number of severe impairments, including fecal incontinence, among others. (Tr. 3084). The ALJ also recognized that Harris regularly complained of, and sought treatment for, recurring diarrhea, even after his sigmoid colectomy. (Tr. 3091). And the ALJ acknowledges that Harris reported frequent restroom trips to Dr. Bard (but does not mention Dr. Bard's observation of the same). (Tr. 3092-93). And the ALJ acknowledged that Harris had findings supportive of colitis. (Tr. 3091). Even so, however, the ALJ does not reference whether or not any of the limitations in the RFC were intended to respond to Harris' continued gastrointestinal complaints or bathroom frequency, or explain any omitted limitations. Without explanation, I am unable to determine the ALJ's decision here, and whether that decision is indeed supported by substantial evidence.

32

I therefore determine that remand is necessary for the ALJ to consider all of Harris' impairments, whether severe or non-severe, form an RFC responsive to those impairments, and adequately explain that decision.

### B.      The ALJ properly addressed the opinions of the state agency medical consultants in accordance with Agency regulations.

Harris next asserts that the ALJ did not mention any of the prior agency reviewers' opinions in the October 3, 2024 decision, despite having considered and explained them in the March 4, 2022 decision. (ECF Doc. 10, pp. 37-39). As Harris claims, the ALJ did not mention these opinions at all in his decision, thereby violating both *Wilson*'s requirement to give "good reasons" in a decision, and SSR 96-2p's requirement that the ALJ give "specific reasons" for the weight given to a treating source's opinion, supported by the record evidence. (*Id.* at p. 8 (quoting *Wilson v. Comm'r*, 378 F.3d 541 (6th Cir. 2004), SSR 96-2p)).

The Commissioner responds to show that, contrary to Harris' view, the ALJ considered and explained the prior agency medical findings in his decision, and the only omission was in naming these prior agency findings by their title as "State Agency consultants" and not specifically by name. (ECF Doc. 13, pp. 6-7). The Commissioner further contends that, because Harris argued that the ALJ did not evaluate the prior agency reviewing opinions at all, he has waived any argument that the evaluation itself was in error. (*Id.* at p. 7).

The Commissioner has the right of it here. Harris' contention that the ALJ either did not or did not fully[2] explain his consideration of the prior agency reviewers' opinions is incorrect in both substance and law.

---

[2] Harris, in his reply brief, argues that the ALJ "made a blanket statement" about the opinions, thus making it deficient according to Agency regulations. (ECF Doc. 14, p. 7). He also raises error with the ALJ's consideration of Dr. File's opinion for the first time in the reply brief. (*Id.* at pp. 8-9). These arguments are waived. *Stewart v. IHT Ins. Agency Grp., LLC*, 990 F.3d 455, 457 (6th Cir. 2021) ("even well-developed arguments raised for the first time in a reply brief come too late.").

As an initial matter, SSR 96-2p and the "treating physician rule" that it describes has been rescinded, and applies only to applications filed before March 27, 2017. Likewise, *Wilson*'s analysis concerned the pre-March 27, 2017 regulations, *see generally Wilson*, 378 F.3d 541, although courts within the Sixth Circuit still apply *Wilson*'s harmless-error analysis, and may consider whether the ALJ has articulated "good reasons" for their decision. *See, e.g.*, *Burba v. Comm'r of Soc. Sec.*, No. 1:19-CV-905, 2020 WL 5792621, at *4 (N.D. Ohio Sept. 29, 2020); *Hambly v. Comm'r of Soc. Sec.*, No. 1:23-CV-501, 2023 WL 9269785, at *18 (N.D. Ohio Dec. 13, 2023), *report and recommendation adopted*, No. 1:23 CV 501, 2024 WL 445249 (N.D. Ohio Feb. 6, 2024). But even so, because Harris' current application was made April 22, 2020, (Tr. 1717-25), his reliance on these regulations is misplaced. On January 18, 2017, the Social Security Administration amended the rules for evaluating medical opinions for claims filed after March 27, 2017. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 404.1520c(a).

At Step Four of the sequential analysis laid out in the regulations, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [he] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). If the ALJ finds that two or more medical opinions "are both equally well-supported and consistent with the record but are not exactly the same," the ALJ must articulate

34

what factors were most persuasive in differentiating the opinions. 20 C.F.R. § 404.1520c(b)(3) (internal citations omitted). Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5).

> The ALJ considered the prior agency reviewing opinions as follows:

> Finally, at the initial level of review, the State Agency consultants concluded that claimant has moderate limitations in the "paragraph B" criteria, resulting in a mental residual functional capacity for understanding, remember, and following 1-3 step instructions. capacity for 1-3 step tasks that are fairly static in nature in a setting without fast paced demands or strict production quotas, and brief superficial interactions in a setting where he is not required to have work related contact with the public. He can perform a set of routine tasks in a setting w here changes are infrequent and easily explained in advance (Exhibit 2A). The State Agency determined that there was insufficient evidence to evaluate claimant's allegations of a severe physical impairment (*Id.*). However, at the reconsideration level, the State Agency consultants determined that claimant has a severe physical impairment and that he could not perform more than light exertion work, further limited to occasionally climbing stairs, occasionally climbing ladders, ropes, or scaffolds; occasionally stooping. frequently kneeling, and occasionally crouching, crawling (Exhibit 4A). The consultants affirmed the findings of the initial level regarding claimant's mental residual functional capacity (*Id.*). I find the State Agency opinion of claimant's mental residual functional capacity persuasive in this case; it is consistent with the overall record of claimant's vague depression and anxiety, low average to borderline intelligence, routine activities. and accepting and carrying out of simple instructions/information. The findings of claimant's physical residual functional capacity is only somewhat persuasive as it does not account for claimant's vision impairment or claimant's need for environmental limitations due to hazards present in a workplace. All other findings are supported, including the findings of claimant's postural limitations due to chronic abdominal and back pain.

(Tr. 3097). With this, the ALJ properly considered the prior agency reviewers' findings, and described them in the required regulatory terms of supportability and consistency. Furthermore, Harris' contention that the ALJ "lumped both [of the physical and psychological opinions] together" and "cited to one exhibit" is not borne out in examining the ALJ's decision. (*Compare* ECF Doc. 14, p. 7 *with* Tr. 3097). Rather, the ALJ distinguished the prior agency findings at the

35

initial level and cited to that exhibit. (Tr. 3097 (citing to 2A, found at Tr. 1602-12)). He also

distinguished the findings at the reconsideration level, and cited to that corresponding exhibit.

(*Id.* (citing to 4A, found at Tr. 1614-24)). The ALJ further described his consideration of the

opinions regarding Harris' "physical" or "mental" RFC, respectively. (*Id.*). The ALJ's omission

of the state agency reviewers' names provides sufficient description to aid in my review. The

ALJ has properly met the goals of Section 404.1520c. *See Wilson*, 378 F.3d at 547. I find no

error with respect to this issue.

## V.      Conclusion

Because the ALJ failed to reach a conclusion supported by substantial evidence, I vacate

the Commissioner's final decision denying Harris' application for SSI and remand his case for

further consideration as described in this opinion.


Dated: August 11, 2026

Reuben J. Sheperd
United States Magistrate Judge

36